# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 52490

| | |
|---|---|
| In the Interest of: John Doe I, John Doe II, John Doe III, John Doe IV, John Doe V, and John Doe VI, Children Under Eighteen (18) Years of Age. ) ) ) ) ) | |
| STATE OF IDAHO, DEPARTMENT OF HEALTH & WELFARE, ) ) ) | Filed: September 22, 2025 |
| Petitioner-Respondent, ) ) ) | Melanie Gagnepain, Clerk |
| v. ) ) ) | **THIS IS AN UNPUBLISHED OPINION AND SHALL NOT BE CITED AS AUTHORITY** |
| JANE DOE (2024-52), ) ) | |
| Respondent-Appellant. ) ) | |

Appeal from the Magistrate Division of the District Court of the Sixth Judicial District, State of Idaho, Bannock County. Hon. Anson L. Call, II, Magistrate.

Judgment terminating parental rights, <u>vacated</u>.

Eric D. Fredericksen, State Public Defender; Jessalyn Hopkin, Deputy State Public Defender, Pocatello, for appellant.

Hon. Raúl R. Labrador, Attorney General; Jason R. Chandler, Deputy Attorney General, Pocatello, for respondent.

---

TRIBE, Judge

Jane Doe (2024-52) appeals from the judgment terminating her parental rights. For the reasons set forth below, we vacate the judgment in this case.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Doe is the mother of John Doe I, born in 2010; John Doe II, born in 2011; John Doe III, born in 2012, John Doe IV, born in 2013; John Doe V, born in 2015; and John Doe VI, born in 2018. The Idaho Department of Health and Welfare (Department) received a report that John

1

Doe III had marks on his neck. The Department learned that these marks were from John Doe I and John Doe II grabbing John Doe III by the throat after the children's father told them to "get" John Doe III. John Doe III was removed from the home and placed in the custody of the Department in May 2023. The Department moved for Doe's other five children, John Doe I, John Doe II, John Doe IV, John Doe V, and John Doe VI, to be placed under the supervision of the Department. In July 2023, the magistrate court entered an order removing John Doe I, John Doe II, John Doe IV, John Doe V, and John Doe VI from Doe's custody. While a case plan was created related to the concerns of the children, Doe was never presented with a case plan related to her. In August 2023, following a status hearing, the magistrate court ordered an extended home visit for John Doe I, John Doe II, and John Doe IV; and an extended home visit to begin at the Department's discretion for John Doe V and John Doe VI. The magistrate court's order included a safety plan that required Doe to take the children to work, supervise the children, keep the home clean, and allow a Safety Monitor to "check the home" every day after 4:00 p.m. and "stay with the family during the weekends." NorthStar In Home Support Services (NorthStar) supervised and interacted with Doe and the children on many occasions and provided reports to the magistrate court.

Eventually, the Department filed a petition to terminate Doe's parental rights alleging (1) Doe neglected the children pursuant to Idaho Code § 16-2005(1)(b)[1] and I.C. § 16-2002(3)(a); and (2) Doe is unable to discharge parental responsibilities pursuant to I.C. § 16-2005(1)(d) and that such inability would continue for a prolonged indeterminate period and will be injurious to the health, morals, and/or well-being of the children. Following the termination hearing, the magistrate court entered a judgment terminating Doe's parental rights based on neglect, I.C. § 16-1602(31)(a). Doe appeals.

## II.

## STANDARD OF REVIEW

On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243,

---

[1]     Since the filing of the petition, I.C. § 16-2005 has been amended. The relevant substance has remained unchanged; however, subsection (1)(b) is now I.C. § 16-2005(1)(a)(ii) and subsection (1)(d) is now I.C. § 16-2005(1)(a)(iv). *See* 2025 Idaho Sess. Laws, ch. 130 at 679.

245-46, 220 P.3d 1062, 1064-65 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Id.* The Idaho Supreme Court has also said that the substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence than in cases where a mere preponderance is required. *State v. Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *Roe v. Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the trial court's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

## III.

## ANALYSIS

Doe argues that the magistrate court erred when it found substantial and competent evidence that Doe neglected the children.[2] Further, Doe argues that the magistrate court erred in finding that it is in the best interests of the children to terminate her parental rights. We hold that the magistrate court's decision terminating Doe's parental rights is not based upon substantial and competent evidence to support a finding that Doe neglected her children.

A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). Implicit in the Termination of Parent and Child Relationship Act is the philosophy that, wherever possible, family life should be strengthened and preserved. I.C. § 16-2001(2). Therefore, the requisites of due

---

[2] The magistrate court found that Doe neglected the children pursuant to both definitions of neglect outlined in I.C. § 16-1602(31) (a) and (b). The magistrate court did not link its findings of "[t]he grounds for termination of [Doe's] parental rights" with a citation to the definition. However, in subsection (a) of its findings, the magistrate court states, "[Doe] has left children *without proper parental care and control, or subsistence, medical or other care or control necessary for their well-being*"--which references the language in I.C. § 16-1602(31)(a). (Emphasis added). Then, in subsection (b) of its findings, the magistrate court states, "[Doe] is *unable to discharge parental responsibilities*"--which references the language in I.C. § 16-1602(31)(b). (Emphasis added). Any alternative grounds for termination will not be considered.

3

process must be met when terminating the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the grounds for terminating a parent-child relationship be proved by clear and convincing evidence. *Id.* Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *see also* I.C. § 16-2009; *Doe v. Dep't of Health & Welfare*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *Doe*, 143 Idaho at 386, 146 P.3d at 652.

The magistrate court's findings of fact and conclusions of law include several references to "the parents." Because Doe has initiated this appeal, we will review any references to "the parents" as a reference to Doe. Such findings will be reviewed for whether they are supported by substantial and competent evidence as applied to Doe.

Idaho Code Section 16-2005 permits a party to petition the court for termination of the parent-child relationship when it is in the child's best interests and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117. Upon finding a statutory ground for termination, the trial court must also find that it is in the best interests of the child to terminate the parent-child relationship. I.C. § 16-2005(1). Both findings must be supported by clear and convincing evidence. Neglect, in relevant part, is defined as a child that is "without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents" or whose "parent . . . is unable to discharge the responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being." I.C. § 16-1602(31)(a)-(b).

A. **Factual Findings**

Doe argues that several legal conclusions made by the magistrate court are not supported by the record. Doe argues that the magistrate court found neglect based on a prior child protection

4

action case (or involvement of the Department of Health and Welfare), the condition of her home, her parenting skills, the sexual behaviors of the children, and the improvement of the children while in foster care. Doe argues that these factors, either considered alone or together, are insufficient for the finding of neglect. The magistrate court found that Doe left the children without proper parental care and control, or subsistence, medical or other care or control necessary for their well-being and is unable to discharge parental responsibilities.

First, Doe argues that the magistrate court's conclusion, that "[Doe] struggled over time and through multiple child protection cases," is not supported by substantial and competent evidence. The magistrate court acknowledged that Doe had a previous out-of-state case regarding the family but noted that the court knew "very little about that case." The magistrate court made no further findings about the out-of-state case, other than at some point there was a case. The magistrate court also found that there was a previous case in Idaho, opened in May 2021, where the children were placed in the custody of the Department. However, the magistrate court found that the children were placed back in the home at different times throughout 2022. In September 2022, the children were taken out of the home for three days when law enforcement declared the children in imminent danger. However, the children were returned when the safety assessor did not agree that the children were in danger. In February 2023, the 2021 case was closed because the minimum, necessary standards for the children to be returned to Doe's custody were met. Finally, the magistrate court found that, in the 2021 case, as required by the previous case plan, Doe moved to a home where there were no safety concerns to prevent the children from returning to her custody.

The case manager, Lyndsey Walls, testified at the termination hearing that, at the close of the 2021 case, Doe was demonstrating the "minimum sufficient level" and that she "had what [she] needed to be successful to move forward without [the Department] being involved." At that time, Walls agreed that Doe was able to take care of the children and was "meeting the mark." The magistrate court made no contradictory factual findings to the testimony provided relating to the previous cases. As the magistrate court only found that it either had limited knowledge of a previous case or that Doe improved as much as necessary to regain custody of the children, the finding that--"[Doe] struggled over time and through multiple child protection cases"--is not supported by substantial and competent evidence.

5

Next, Doe argues that the magistrate court did not have substantial and competent evidence to support its finding that she "has not been able to secure adequate income to appropriately address the housing needs of the family." The magistrate court made no factual findings concerning Doe's income or employment status.

The magistrate court heard testimony from a case manager, Kathy Lake, who assisted Doe with budgeting for approximately four years prior to the termination hearing. Lake testified that Doe's budget "has always ebbed and flowed" causing her to "play catch up" with bills. Lake testified that Doe "just paid off [her] water, sewer[,] garbage bill," but that she was "hit with over use of level pay" and is "struggling to figure out how to get that caught up" with her gas bill. The magistrate court heard that Doe "work[s] really hard" as a driver for Door Dash to try to get current on bills. Lake testified that, when Doe recognizes she is behind on bills, she "get[s] in there and get[s] [the] stuff paid for." When asked if Doe was at risk of "losing [their] trailer," Lake testified, "as far as I know [Doe is] not." Lake also testified that Doe has been "proactive in accessing some financial resources."

Finally, when asked about Doe's financial stability, Lake answered that, until Doe got the gas bill, she "did a fairly good job." Lake explained that, while Doe had to pay "pretty good chunks" of bills to keep water, sewer, and garbage from being turned off, she was "very good at paying [her] rent and [her] other bills." Finally, Lake agreed that Doe had been living in the same home for about four years and that Lake would call that "housing stability." The magistrate court also heard NorthStar's service operations manager, Laura Call, testify that a "lack of income" was not a problem with "keeping the house clean." The Department has not directed this Court to any contradictory findings indicating that the magistrate court had substantial and competent evidence to find that "[Doe] has not been able to secure adequate income to appropriately address the housing needs of the family." The magistrate court's finding that Doe has not been able to secure adequate income to appropriately address the housing needs of the family is not supported by substantial and competent evidence.

6

Next, Doe argues that the magistrate court did not have clear and convincing evidence to find that she was aggressive,[3] resistant to help, that she "only interacted with the children as the case progressed," and that she failed to apply the help she received. These findings from the magistrate court are encompassed in a section titled "Parenting Skills." In that section, the magistrate court identifies Doe's shortcomings and finds that she continues "to struggle to properly parent [the] [c]hildren," has been "resistant to instruction from case workers," plans to "return to [her] previous parenting methods if the case were closed," has "made more effort to interact with the [c]hildren as the case has progressed," and has been "described as getting aggressive with those trying to correct" her poor parenting practices.

At the termination hearing, the magistrate court heard from several witnesses that, while Doe tried to and was willing to improve in her parenting skills and has demonstrated moments of improvement, she did not consistently improve her parenting skills or ability to discipline the children. While the magistrate court heard evidence that Doe tried and was able to implement some of the parenting skills she received, it also heard that they were not applied consistently. The magistrate court heard testimony from Misty O'Shia, a NorthStar visitation worker and parenting class instructor. When asked about Doe's efforts to discipline the children, O'Shia testified: "I think [Doe] did a good job. I think it's important to note that she had--she established a loving relationship with the kids. So they felt safe and they felt more comfortable doing what she asked because she established that bond with her kids." When asked how Doe would handle the children when they were getting "crazy or out of line," O'Shia responded that Doe "handled it relatively well" and, after asking the kids to do things, "she would show love and kindness afterwards." O'Shia testified that the children's father's "lack of progress" in parenting the children impeded Doe's ability to parent them. When describing the aggression by the children's father, O'Shia testified that John Doe III "would favor [Doe]. And there were many times he would go to [her] knowing that she would comfort him" and that if the children's father was "being overly aggressive then [John Doe III] would go to [Doe]."

---

[3] A significant amount of testimony was provided that the children's father was aggressive, but little to none of this aggression is directly attributed to Doe. There is one mention of potential aggression from Doe when Lake says, "all of them just seem to be more aggressive with each other."

The magistrate court heard from NorthStar's family preservation worker, Abigail Jones, who was assigned to be a "parenting coach" for Doe and also supervised the family. Jones testified to Doe being successful with three out of the four steps used to create boundaries for the children and that Jones has seen Doe "put forth the effort multiple times to do boundaries." She also testified that Doe would yell at the children, but Jones did not "think there's aggression behind her yelling." Jones also testified to helping Doe create rules for the children, and when asked whether Doe was "able to utilize those rules to properly discipline the children," Jones testified that "[Doe] did." Jones also testified that Doe's progress was not "sufficient" because it "just wasn't moving quickly enough." When Call was asked whether she saw "steady progression in [Doe's] ability to discipline the kids," she responded, "yes." After "working with them for six months," Call recently saw the "first follow-through" with discipline "a couple weeks ago" but there were no examples of the children's father disciplining or correcting the children. Call also agreed that, when she intervened, Doe was "willing to listen" and "accept correction," and Call gave an example of Doe accepting direction. Call also testified that there were times that she and Jones were alone with the children because there were certain times neither parent was watching one or more of the children. She also testified that, while the improvements were not sustained, when Call approached Doe to discuss that Call was alone watching the children, Doe, not the children's father, would "make a point to keep an eye on [the children] better" during the next visit.

Based on the above, there is not substantial and competent evidence to find that Doe failed to consistently apply the help she received. The magistrate court heard several instances where Doe would be instructed on how to change a parenting skill and would then implement those practices in real time. The magistrate court also heard testimony that Doe was open to changing and tried to implement skills learned in parenting classes and supervision. Jones testified that Doe has tried to use disciplinary methods other than yelling and Jones gave the example that, when one of the children attempted to hit another, Doe "did very good at saying, 'Do you think your brother likes being hit?' or 'Would you like to be hit like that? So why did you do it?' She was very effective." Jones testified that Doe "puts in an effort, but it's not always effective." Regarding parent coaching, Jones testified that Doe "put in a lot of effort to understand," "she was able to repeat things back," and Jones saw Doe "implement certain things that [they] talked about with the boys." When asked if Doe could retain the coaching from week to week, Jones responded,

"yes." When asked whether communication between Doe and the children improved, Jones responded that it had improved "quite a bit." Jones identified that Doe is "very affectionate" with the children and "is usually very quick to ask . . . 'How did your week go?'" Jones indicated she thought Doe is "open to changing."

Kim Adair-Boswell, a foster care supervisor, worked with the family from January 2024 to March 2024. Adair-Boswell testified that she observed Doe try to put a child in time-out but it was not done "the right way" because the child still interacted with others and held on to his toy during the time-out. Adair-Boswell indicated that this was a concern because discipline will not work if not done correctly. When asked if there was any improvement in Doe's ability to watch over and discipline the children, Adair-Boswell noted that Doe "seemed to try."

Jones testified that she had a conversation with Doe about corporal punishment and her desire to return to using it after the child protection case closed. However, she also testified that Doe's "opinion has probably changed because it's been so long." When asked whether Doe or the children's father were "aggressive" toward the workers, O'Shia testified that she could not recall that but provided examples of the children's father being aggressive toward the children. When asked why she terminated her visitation with the family, O'Shia testified that she felt unsafe because there "was a lot of feelings. A lot of arguing. Specifically, with [John Doe III], the dad would often stand over [John Doe III] and yell at him and chose him to focus on or correct as well." When asked to give examples, O'Shia testified that, when she asked the family to perform tasks like picking up dog feces on the floor, the parents would "raise their voices" and "there was swearing" but that there was never a threat. When Jones was asked if Doe or the children's father were ever abusive or directed yelling or vulgarity at her personally, she responded, "No. Never directed at me."

Therefore, there is not substantial and competent evidence to support a finding that Doe was "resistant to instruction from case workers," plans to "return to [her] previous parenting methods if the case were closed," or was "getting aggressive with those trying to correct" poor parenting practices.

Next, Doe argues that the sexual behavior exhibited by some of the children was insufficient to constitute neglect. First, the magistrate court found that "there have been concerning sexualized behaviors observed by visitation work[er]s" such as "twelve year old [John

9

Doe II] sitting on [Doe's] lap, straddling her, facing toward her, while they licked each other's faces." The magistrate court heard from O'Shia who observed this act between the child and Doe. When asked about the "children exhibiting sexual behavior" during her supervision, O'Shia testified that Doe told the child not to "make out" with her. O'Shia testified that she could not "determine if it was sexual or not" but that it was "worrisome." Call later testified that she had observed the family "play this game where they do cow kisses" and they will lick others. When asked, "what about that is not appropriate," she responded by saying, "[i]t's just gross I guess."

The magistrate court also found that "some of the [c]hildren have engaged in inappropriate sexual contact with one another while in foster care." Specifically, the finding included two of the children "romantically kissing" in a "swim spa" and one of the children taking his "private parts from his swimsuit" and gyrating in another child's face. The magistrate court also found that one of the other children found the same two children that had been in the swim spa "in bed naked together 'doing things'" and found that this type of contact had been going on for five years but that one of the children said "it was ok because" they are brothers. Kiyanna Cortes, a case assessor, performed a forensic interview of the children and indicated the inappropriate behavior persisted about four years.

The magistrate court found that "[Doe] has not properly addressed sexual contact between [the] [c]hildren." However, the magistrate court also noted that it was "unclear whether [Doe] knew of this contact over the years it has occurred." Still, the magistrate court noted that "it seems [Doe] has not exercised reasonable supervision to notice and address the conduct, as it was discovered quickly and through multiple sources by a foster mother." The magistrate court found that the sexual acts occurred while the children were in foster care yet, still, the magistrate court faults Doe with failing to supervise and address conduct that has not been found to have occurred while the children were with her. To the contrary, the magistrate court heard testimony from Cortes that the sexual contact happened outside Doe's home and that Cortes was not sure if the contact ever happened in Doe's home. When asked whether Doe or the children's father knew about the sexual contact, Cortes indicated that "one of the children was nervous about dad knowing about the sexual acts." Kailee Jackman, a social worker, testified that Doe made some inconsistent statements regarding her knowledge of the children's sexual behavior, but this potential inconsistency regarding her knowledge was not in the magistrate court's findings and it is not clear

10

from Jackman's testimony that Doe knew what was going on. The magistrate court's finding, that the sexual contact continued as a result of Doe failing to properly address the sexual behavior, is not supported by substantial and competent evidence.

## B.     Statutory Grounds

The Department relies on *Idaho Dep't of Health & Welfare v. Doe*, 149 Idaho 564, 237 P.3d 661 (Ct. App. 2010), in support of its argument that the magistrate court's termination decision should be affirmed. In *Doe*, this Court upheld a termination of parental rights when the magistrate court heard testimony of witnesses that the parents were "unwilling or unable to provide the extent of care and stability necessary for their children's well-being." *Id*. at 568, 237 P.3d at 665. Further, while the children's parents and their relatives testified that some progress was made, that "progress was not for any significant period of time especially in light of [the parent's] turbulent history and tendency to relapse into destructive patterns of parenting." *Id*. at 569, 237 P.3d at 666. This Court noted that the parents' testimony of their progress lacked credibility because, over the two years of the child protection case, any periods of progress were followed by a relapse to old ways. *Id*. The magistrate court found that one child was exhibiting sexual behaviors such as teaching her kindergarten classmates how to "pole dance" and was now subjecting another child to abuse due to a lack of supervision. *Id*. at 566-67, 237 P.3d at 663-64.

The magistrate court in that case also found that the parents were evicted several times for failure to pay rent; did not comply with the case plan by moving out of state without written permission from the court and the Department and having alcohol in the home; and failed to comply with recommendations to completion in substance abuse evaluations and treatment, couple's counseling, and a parenting course. *Id*. at 566, 237 P.3d at 663. While in the custody of the Department, the children required extensive dental work, and one child was behind on vaccinations. *Id*. at 567, 237 P.3d at 664. Also, while the children were in the custody of the Department, the parents ignored orders to pay child support and failed to maintain regular phone contact with the children despite being permitted to do so. *Id*. This Court upheld the magistrate court's termination decision and held that the parents "had over two years to demonstrate their love by making the necessary reforms in their lives in order to provide proper parental care and control for the children." *Id*. at 569, 237 P.3d at 666.

11

Unlike the case plan in *Doe*, the pendency of this case only lasted thirteen months. Further, Doe has lived in the same home for four years and, while periodically behind on bills, has worked with the resources provided to her and worked extra hours to catch up on her bills. There is no indication that Doe did not comply with the recommendations to participate in any courses or counseling available to her. There is also no finding by the magistrate court that the children were not receiving proper medical attention while in Doe's care. Further, the magistrate court heard that Doe attended most of the visits with the children, and the missed visits were due to investigations going on with the children regarding the sexual activity or due to weather conditions that made travel to visitation dangerous. Doe attended visitations, tried to implement skills learned during parenting classes and visitations (although she failed to apply them consistently), and improved the condition of her home.

The magistrate court was unable to discern whether Doe was aware of the sexual relationship between the children (or whether it ever happened while the children were at Doe's home), yet the magistrate court still attributed this behavior to Doe's lack of supervision. The magistrate court heard testimony from multiple witnesses that Doe is open to changing her parenting style. The testimony included that Doe might have changed her stance on returning to her original parenting style because it had been so long since she expressed her desire to return to corporal punishment at the conclusion of the case. Upon review of the evidence presented and the legal standard for neglect, we conclude there was insufficient evidence to terminate Doe's parental rights on this basis.

## C.    Best Interests

Doe also argues that the magistrate court erred in deciding that termination is in the best interests of the children. Doe argues that the magistrate court failed to address or "put any weight on" certain factors in her favor in the best interests analysis. The Department argues that the lack of Doe's progress and the children's improvement while in the custody of the Department support the magistrate court's finding that it is in the best interests of the children to terminate Doe's parental rights. Because we hold that the magistrate court erred in finding a statutory basis for termination, we need not address the magistrate court's best interests analysis or the parties' arguments in relation thereto.

## IV.
## CONCLUSION

The magistrate court's decision terminating Doe's parental rights is not based upon substantial and competent evidence to support a finding that she neglected her children. We need not address Doe's arguments regarding the best interests of the children based on our decision that there was no statutory basis for termination. Accordingly, the judgment terminating Doe's parental rights is vacated.

Judge HUSKEY and Judge LORELLO, **CONCUR**.